IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

_____

J&S WELDING INC.,

    Plaintiff,

  v.                                          Case No.

LIBERTY MUTUAL INSURANCE COMPANY            1:22-cv-01122

and WEST AMERICAN INSURANCE

COMPANY,

    Defendants.

_____

DEPOSITION OF BEAU EDDINGS AS
30(B)(6) CORPORATE REPRESENTATIVE FOR
J&S WELDING INC.

DATE:        Friday, March 24, 2023
TIME:        11:26 a.m.
LOCATION:    Nathan Pride Law Offices
             423 North Highland Avenue
             Jackson, TN 38301
REPORTED BY: Robin Luttrell
Job No. CS5800295

**Exhibit 2**

1    Q   As I understand it from the complaint, the
2  insured premises is the property located at 2579 North
3  Avenue, Humboldt --
4    A   9th Avenue.
5    Q   I'm sorry.  North 9th Avenue, Humboldt; is
6  that right?
7    A   Correct.
8    Q   It says, "Humboldt, Trenton, Tennessee."  It
9  should say, "Humboldt, Tennessee"; right?
10    A   That is wrong.  Yes.  You are correct, that
11  Trenton has nothing to do with it.
12    Q   And 2579 North 9th Avenue is these two
13  buildings you told me about earlier; right?  That's
14  that address?
15    A   Correct.  Correct.
16    Q   King Tire has a different address; is that
17  right?  All right.  The next page, it says -- I just
18  want to give you some context here -- it says, "On or
19  about August 21, 2020, a storm caused severe hail and
20  wind damage to the exterior and interior finishes of
21  the Insured Premises."
22       So, the allegation is that on August 21,
23  2020, a storm occurred and y'all had damage.  And
24  you're shaking your head no.

Page 25

| | | |
|---|---|---|
| 1 | A | Wrong.  That is not right. |
| 2 | Q | Okay.  What's wrong with that? |
| 3 | A | It was May 4th. |
| 4 | Q | How do you know that? |
| 5 | A | 'Cause it tore up the whole town. |
| 6 | Q | All right.  So, did a tornado come through or was it just -- |
| 8 | A | Just a super bad storm that was full of hail and got everybody in town, honestly. |
| 10 | Q | Okay.  What does this August 21st date mean to you?  Was there another storm that day, to your knowledge? |
| 13 | A | Yeah.  There was in early fall, late summer, there were some storms.  But there was a drought between spring and then, and we had, like, 2 1/2, 3 months of no rain.  So, I do remember when we started getting rain again, it was pretty good rain and that it was a storm. |
| 19 | Q | Okay.  I understand. |
| 20 | A | That's pretty well when all of the leaks showed up. |
| 22 | Q | All right.  So, is it your testimony that in the complaint, Paragraph 11, it should, instead of saying August 21, 2020, it should say May 4, 2020? |

1        A    Correct.
2        Q    Or should it say both May 4th and August
3    21st?
4             MR. BERKLEY:  That's probably a lawyer
5    question.  It wasn't his question, is what the
6    complaint should say.  That's probably legal opinion.
7    I don't know if he can answer that.
8        A    Should it?  I don't know how to answer it, I
9    mean, honestly, because May the 4th, you could see it
10   all over the whole town.  This storm was a storm, and
11   it rained for two days, 4 inches.  And best that I
12   remember -- now, was there significant stuff in the
13   middle of the night that made this storm do damage?  I
14   don't know.  I was at home.
15       Q    Okay.  But your personal memory is that May
16   4, 2020, was a hail event, it sounds like; is that
17   right?
18       A    Very bad.  Yeah.
19       Q    And you were there when that occurred?  Was
20   it during the daytime?
21       A    It was right after quitting time, time to go
22   home.  We all kind of drove into it on our way home.
23       Q    Okay.  Was anybody present in the building,
24   still at work, to your knowledge, on May 4, 2020,

1      during the hailstorm?
2           A    No.  Not with that one.
3           Q    The later event that you recall after the
4      drought ended -- it may have been August 2020, I don't
5      want to say that, but -- the later event, was anybody
6      at work when that happened?
7           A    That storm was late afternoon.  It started
8      at, like, lunch and had done its thing and moved on
9      into the night.  We left with, you know, doom and
10     gloom outside.  Yeah.  I remember that.  And then it
11     rained on into eight, nine o'clock that night.
12          Q    And when you say it rained, did it have any
13     hail in it to your knowledge?
14          A    From the time, from while I was at work, no.
15     I live 30 minutes away.  I left at four o'clock, and I
16     know it was raining cats and dogs until I went to bed.
17     And it's hard for me to say much about the 21st of
18     August.
19          Q    Okay.  Going back to Paragraph 10, which
20     will be on the previous page of Exhibit 2, it says,
21     "The Insured Premises" -- it sounds like these two
22     buildings were free from significant deterioration or
23     preexisting damage and maintenance support as of the
24     date of this storm, I think, is what the allegation

1   is.  Is it your position that the buildings, the two
2   buildings at your property, had no hail damage on them
3   before May 4, 2020?
4        A    That's my position.  Correct.  Yeah.
5        Q    All right.  And it says premises were
6   maintenance supported; what does that mean?
7        A    Maintenance supported, now, my definition of
8   that is take care of your stuff.  So, yes.  Has it
9   been -- everything done?  Now, what I do is extremely
10  violent.  You know, it's rough on a building and
11  tools, but I have to take care of it, you know,
12  somewhat.  But I don't recall anything being left,
13  neglected.  I mean, I've always tried to do my
14  maintenance to take care of my building, you know, the
15  best I can.
16       Q    Okay.  That's fair.  Specifically with
17  regard to the roof on both the big building and what
18  we'll call the smaller building in the back, had the
19  J&S Welding employees done any work to make repairs to
20  the roofs since you've owned it in 2013 prior to this
21  May 2020 --
22       A    Me and my employees, no.  I mean, we ain't
23  roofers.  I've had people, you know, check it every
24  five years just to see what, you know, it may need,

1     something wrong or if we tear something up ourselves,
2     you know, we try to face it, or we do.  I mean, or get
3     somebody to help us.  It's just when you go up there,
4     it's not our thing.
5          Q    I understand.
6          A    Yeah.  We're always doing maintenance around
7     there to keep everything working.
8          Q    In that regard, have you -- since you've
9     owned this in December 2013, have you had anyone
10    replace the middle panels on the sides of either of
11    these buildings due to some sort of damage or event?
12         A    No.
13         Q    Have you had anyone replace the insulation
14    on the interior of the structure, either under the
15    roof or on the siding?
16         A    No.
17         Q    Let's go to Paragraph 22.  It's on page 5 of
18    10 of the complaint.  It reads, "The Insured Premises
19    were seriously damaged by high winds and hailstorm
20    compromising the Plaintiff's roofing system, and
21    siding, allowing moisture infiltration"; do you see
22    that?
23         A    I do.
24         Q    Does that accurately describe what happened

Page 38

1    Q    Does the larger building that experienced
2    the double digit drips beginning May 4, 2020, does it
3    still leak today?
4    A    No.  It does not.
5    Q    When did it stop leaking?
6    A    When I had the ceiling ceramic-coated.
7    Q    By Shrock, I think it is?
8    A    Yeah.  Shrock.  Yeah.  Acrylic coating,
9    ceramic.  I don't know.  Fancy word for glass.
10   Q    Did you hire Shrock or did Mr. Griffin hire
11   them, to your knowledge?
12   A    I did.
13   Q    How did you find them?
14   A    Well, my customers had several industrial
15   rental properties here in Jackson and he uses them.
16   And I was talking to him about the problem and he gave
17   me his number and I called him and he came and we
18   discussed and he fixed it.  And that was pretty well
19   all of that.
20   Q    I've been on that roof.  I've seen the
21   product.  I'm not a roofing guru, so forgive me.
22   Ceramic, whatever you want to call it, whatever they
23   did, did they tell you how long that's supposed to
24   last?

1    it's Nebraska or Oklahoma or something like that.
2         Q    This gentleman who came down from out of
3    state, is that who you spoke with after the job was
4    completed also?
5         A    He's the one I handed the money to.  Yeah.
6         Q    Okay.  Is it also the gentleman who told you
7    that the wind had shifted or somehow moved the tin --
8    I shouldn't say tin -- the metal atop the roof?
9         A    Actually, no.  It was -- the guy that told
10   me that was this local guy that actually came and met
11   me in the beginning.  When my customer gave me the
12   number, that's the guy he gave me the number to, and
13   then he set the deal up for them to come and do.  They
14   move around in a large group and just hit a bunch of
15   them as they go.  Kind of the way their business
16   works.
17        Q    The part I didn't quite understand was
18   somebody told you they didn't guarantee some seal.
19   They were going to do the best they could or
20   something.  But was that the general application or
21   some other part of what they were doing?
22        A    Getting out of my -- I've never walked on
23   the roof.  I couldn't tell you.  I mean, I just know
24   that metal is the word we're using for the tin, and it

1    Q    Individually.  Anybody else that you
2    consider a representative of J&S?
3    A    No.
4    Q    Mr. Griffin maybe, as the public adjuster?
5    A    Yeah.  I guess.
6    Q    Anybody else?  I mean, you know --
7         MR. BERKLEY:  That's a lot of lawyer
8    questions now.  If he doesn't know, he doesn't know.
9         THE WITNESS:  I'm a welder, man.
10        MR. NEAL:  I don't know what
11   "Plaintiff's representatives" means, either.  That's
12   why I have to ask the question.
13        MR. BERKLEY:  Let's go off the record.
14        (Discussion held off the record.)
15        MR. NEAL:  Yeah.  We'll go back on.
16   BY MR. NEAL:
17   Q    That's where I'm headed with this.  Who has
18   knowledge, so I can ask them questions and discover
19   information?  You?
20   A    Of what?
21   Q    The damage to your building that relates to
22   this hail and wind storm.
23   A    It would be me, from hearsay, from William;
24   you, 'cause you've been on my roof; and the whole crew

1  of people that went up there.  There's been people out
2  at my shop full-time.  I do not know who they all are.
3  That's about it.
4              MR. BERKLEY:  Well, you're looking for
5  rules.  You see what I'm saying?  You're a material
6  witness.
7  BY MR. NEAL:
8       Q    Drew Agee would be somebody?
9       A    He's not been on it since this.
10      Q    That's fair.  H&H hasn't been on it since
11 this?
12      A    No.  Nobody's been on it since then, except
13 for Shrock, to look at it real quick and to fix it.
14      Q    And in the case I had --
15      A    William had a guy with him when they'd come
16 out there at night and took those infrared pictures or
17 whatever.
18      Q    Yeah.  And --
19              MR. BERKLEY:  Is that --
20              MR. NEAL:  I don't know.
21              MR. BERKLEY:  You don't know?
22              MR. NEAL:  We'll get to that.
23 BY MR. NEAL:
24      Q    In the case -- I took the deposition at nine

1    it's still wood, 'cause the panel hasn't been changed
2    or nothing to fix it in the panel.
3         Q    I've seen some photos of the interior.  If I
4    stepped into your building, it was one or two steps.
5    But I didn't really walk around the interior.  I was
6    on the outside.  Stains or watermarks in the
7    insulation, do you see that inside the building or no,
8    right now?
9         A    No.  I don't reckon.  I mean, 'cause we've
10   literally had engines explode and throw oil on the
11   ceiling, it's hard for me to say what's water and
12   what's not.  But if it's drip, drip, drip, and I see
13   it splashing on the concrete floor, that's a leak to
14   me.
15        Q    Okay.  Has anyone advised you that J&S needs
16   to have its roof replaced atop the big building?
17        A    It's been mentioned.  And maybe it was
18   William that said, "Fix it.  Fix it right, and get the
19   dents all out and get all the metal to where it lays
20   back down and doesn't cause this water to come in.
21   It's going to have to be replaced."  Nobody else has
22   looked at it, I mean, other than the guys that fixed
23   it, and they weren't going to tell me that 'cause they
24   wanted to do what they wanted to do.

Page 70

1   Q   If these insurance proceeds are paid, would
2   you replace the roof or would you leave it as it is
3   with this sealant applied?
4   A   You asking me if I would?  I'm going to
5   replace it.
6   Q   Have you had anybody other than Mr. Griffin
7   give you estimates for what it'd cost to replace that
8   roof?
9   A   No.
10  Q   To your knowledge, would Mr. Griffin himself
11  or his company be able to replace the roof for you?
12  A   No.
13  Q   Has he told you who he recommends you use to
14  replace the roof?
15  A   No.  He hadn't, and I hadn't asked, and he
16  didn't offer because I've got so many actual customers
17  that do that kind of stuff.  I would just find the one
18  I thought best.
19  Q   All right.  I'm going back to witnesses who
20  may have knowledge of either hail damage to your
21  building or water intrusion in your building following
22  this hail event and wind event.  We've got you, Mr.
23  Griffin.  You named me.
24  A   There's been eight or ten people up there,

Page 73

1    time.
2         Q    To your knowledge, is that roof, the metal
3    roof that's up there, was it the one that was
4    installed in '82 and '83?
5         A    To the best of my knowledge, from what
6    investigations I've done, I mean, I ain't going to lie
7    to him.  And I never -- I said I've been there since
8    2005, and I ain't never seen nobody up there messing
9    with it.
10        Q    And then has anybody told you what the
11   longevity of one of these roofs is, like, how long a
12   commercial metal roof is supposed to last?
13        A    Well, not about this particular building,
14   but I have a personal shop that they give me a 40-year
15   guarantee on the metal and the roof and the screws.  I
16   mean, I thought that was pretty good.  That's been
17   built in the last five years, so, I mean, versus 1982,
18   I don't know.
19        Q    Is that your personal property, this other
20   shop, not owned by J&S?
21        A    Yeah.  Yeah.  It's in my house.
22        Q    Do you have an ownership interest in any
23   other companies other than J&S?  Is that a "No"?
24        A    Yeah.  No.  I didn't have enough brain time

1  for that.
2       Q   Going back to this amended notice of
3  deposition, we're going down to Number 3 now.  All
4  information in support of your allegation in Paragraph
5  16 to 20 that my client severely undervalued the
6  claim.  We can go back and look at the complaint if
7  you want to.
8              MR. BERKLEY:  You talking about the
9  complaint?
10             MR. NEAL:  Yes, sir.
11             MR. BERKLEY:  The lawsuit?  You're
12  talking about Paragraph --
13             MR. NEAL:  Yeah.  Yes.
14             MR. BERKLEY:  Number 16.
15             THE WITNESS:  "Damage from wind and
16  hail are covered perils"?  That's where we're at?
17             MR. NEAL:  Yes, sir.  The next
18  sentence.
19             THE WITNESS:  "Defendants admitted
20  there was damage but severely undervalued the claim."
21  I admitted there was damage, but --
22             MR. BERKLEY:  No.  Defendants is his
23  client.
24             MR. NEAL:  You're the plaintiff.

Page 75

1               THE WITNESS:  Okay.  All right.
2     BY MR. NEAL:
3         Q   So, let's just start there.  "Defendants
4     admitted there was damage."  Are you aware that West
5     American Insurance Company -- we contend that Liberty
6     Mutual shouldn't be sued.  It was West American
7     because they're the one that actually issued this
8     policy.
9               Now, West American and Liberty Mutual are a
10    part of the same big organization, but West American
11    is who actually wrote this policy.  Are you aware that
12    West American issued some payments with regard to this
13    loss?  Is that a "Yes"?
14        A   That's a yes.
15        Q   Did you cash your checks, to your knowledge?
16        A   I did.  I waited until the time that I
17    thought was deemed to get permission to from said
18    William Griffin.  And I did, and I used that money to
19    do the roof.
20        Q   The Shrock sealant coating?
21        A   Correct.
22        Q   Any other things you've done with those
23    funds to the property itself, like, the roof or
24    otherwise?

Page 76

1      A    All of it's back invested in the shop.
2  Not -- I fixed the roof, and then everyday stuff.
3      Q    You spent the rest; is that --
4      A    I'm sure it's still in the bank account
5  somewhere.
6      Q    Okay.
7      A    There's money there, but.
8      Q    Then you say they've severely undervalued
9  the claim; what support does J&S Welding have that my
10 clients severely undervalued the claim?
11     A    Well, I don't -- I don't know that I'm the
12 one you're supposed to be asking the question.
13         MR. BERKLEY:  I think the answer is he
14 doesn't really know.  That's something that would
15 be -- that's something that would be better answered
16 by --
17         THE WITNESS:  I didn't set the
18 processes that are on these quotes; you know what I
19 mean?  So, how do I know if it's undervalued or
20 overvalued?
21 BY MR. NEAL:
22     Q    Yeah.  That's where this gets a little hard
23 for me.  So, I've set the deposition of the company.
24 And the company's made the allegations.  And I'm

1      CERTIFICATE OF DEPOSITION OFFICER

2              I, ROBIN LUTTRELL, the officer before whom
3      the foregoing proceedings were taken, do hereby
4      certify that any witness(es) in the foregoing
5      proceedings, prior to testifying, were duly sworn;
6      that the proceedings were recorded by me and
7      thereafter reduced to typewriting by a qualified
8      transcriptionist; that said digital audio recording of
9      said proceedings are a true and accurate record to the
10     best of my knowledge, skills, and ability; that I am
11     neither counsel for, related to, nor employed by any
12     of the parties to the action in which this was taken;
13     and, further, that I am not a relative or employee of
14     any counsel or attorney employed by the parties
15     hereto, nor financially or otherwise interested in the
       outcome of this action.

16

17

18
19
       ROBIN LUTTRELL
20     Certified Reporter in and for the
       State of Tennessee
21     [X] Review of the transcript was requested.

22

23

24

1      CERTIFICATE OF TRANSCRIBER

2           I, BRENNA SHEA, do hereby certify that this

3      transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14

15     *[signature: Brenna Shea]*

16           BRENNA SHEA

17

18

19

20

21

22

23

24